Cameron C. Artigue #011376
Christopher L. Hering #028169
**GAMMAGE & BURNHAM, P.L.C.**
ATTORNEYS AT LAW
40 NORTH CENTRAL AVENUE
20TH FLOOR
PHOENIX, AZ 85004
TELEPHONE (602) 256-0566
FAX (602) 256-4475
EMAIL: CARTIGUE@GBLAW.COM
CHERING@GBLAW.COM

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Cardinal Square, Inc., an Arizona non-profit corporation,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>Mina Guiahi,<br><br>　　　　　　Defendant. | No. 2:21-cv-00314-PHX-JAT<br><br>**RESPONSE TO CARDINAL SQUARE'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

Mina Guiahi ("Guiahi") submits this brief in opposition to the application for temporary restraining order filed by Cardinal Square, Inc. ("Cardinal Square"). This response is supported by the Declaration of Mina Guiahi, attached as Exhibit 1.

**I.    Factual Background**

Mina Guiahi has resided in New York since 2003. Guiahi spent 18 years on Wall Street in investment banking and portfolio management, with extensive professional experience in the cannabis industry. From 2017-2019 she was a senior investment banker in the cannabis group at Cowen Inc., a well-known investment bank in the cannabis sector. In March 2019, she joined The Pharm, LLC ("The Pharm") as Head of Capital Markets and M&A, and was promoted to Chief Financial Officer in September 2019.

1    In February 2020, Guiahi became one of the two directors of Cardinal Square. The other director was Michael Wang—who is central to this dispute. Cardinal Square's Third Amended and Restated Bylaws (the "Bylaws") vest management authority in the two member board of directors. Section 6.1 provides that a director remains in office "until he or she resigns or is removed from office pursuant to the provisions herein." The Bylaws contain no provision for one director to remove the other. The Bylaws are attached as Exhibit 2.

The Bylaws state that Cardinal Square "shall at all times be governed, managed, administered and operated pursuant to and in compliance" with Arizona's medical marijuana program, which is administered by the Arizona Department of Health Services ("ADHS"). ADHS issued a marijuana dispensary license to Cardinal Square, but no dispensary has ever been associated with Cardinal Square's license. Thus, Cardinal Square has never actively engaged in the medical marijuana business in Arizona.

Guiahi's extensive experience with Wang occurred not in connection with Cardinal Square, but with The Pharm. During the time Guiahi served as the The Pharm's Chief Financial Officer, Wang served as The Pharm's President, COO and Co-CEO. Unlike Cardinal Square (which is a non-profit entity), The Pharm is a for-profit entity. It has no agreements with Cardinal Square or any ability to control Cardinal Square. Both Wang and Guiahi resigned from The Pharm in the summer of 2020.

Arizona's voters approved the creation of a recreational marijuana program in the November 2020 election, and ADHS has started accepting applications. Entities that already hold licenses for medical marijuana can apply for so-called "dual licensure" until March 9, 2021. Cardinal Square (perhaps operating at the direction of Wang alone, rather than as a Board of Directors) purports to have decided to apply for such a license. Per ADHS regulations, the application must include the attestation from all directors of Cardinal Square. A.A.C. R9-18-303(E)(1).

Guiahi owes a fiduciary duty to Cardinal Square, which includes a duty to avoid any risk that Cardinal Square will run afoul of federal or state law. Guiahi is deeply concerned about signing the attestation that would enable Cardinal Square's participation in Arizona's recreational marijuana program, due solely to the conduct and character of Michael Wang. While they worked together at The Pharm, Wang exhibited a consistent willingness to violate the Controlled Substances Act and similar Arizona laws. Wang tolerated and encouraged legally risky, non-compliant and deceitful behavior.

In May 2020, Wang instructed Guiahi to pay an invoice for the interstate purchase and transport of cannabis seeds from California to Arizona, violating federal and state laws. The federal penalty for drug trafficking for this amount is up to five years in prison. Attached as <u>Exhibit 3</u> are text messages exchanged between Guiahi and Wang, in which Wang promoted the scheme, urged Guiahi not to use The Pharm's email system to discuss it, urged her to keep the plan secret for "legal reason" while telling Guiahi "It is best you do not know or ask," and noted the head grower who lined up the seeds for over five months did not want the CFO to be involved. Guiahi immediately rejected the drug trafficking payment and stated "It is not worth the risk of losing our licenses, company and personal liability."

Wang also has a history of non-compliance involving Dispensary Agent Cards, which ADHS requires for all dispensary-related employees. In March 2019, during an ADHS inspection visit to a different license holder—to a facility where Wang was in charge—the licensee was caught with about 50 employees who were not licensed. Live video coverage showed these 50 employees fleeing out the back door during the ADHS inspection. This severe violation resulted in a Notice of Default to the license holder and resulted in an almost yearlong settlement process with ADHS. And Wang himself, as an executive of The Pharm in charge of the facility, did not himself have a Dispensary Agent card. At this time, almost all of The Pharm's revenue was derived from the sales at this

1  particular cannabis facility.  Wang's failure to comply with the law placed The Pharm at
2  severe going concern risk especially in light of the Pharm's inadequate capital position.
3  　　　　Plaintiff's complaint was verified by attorney Laura Bianchi, who represented The
4  Pharm during this ADHS settlement.  Bianchi was candid regarding Wang's Dispensary-
5  Agent violations and drug trafficking actions—she claimed she has "emails from him
6  [Wang] even after months and months of dealing with the ADHS consent agreement, in
7  which he still was letting non-DA card holders go to the facility" and described Wang's
8  behavior regarding drug trafficking as "criminal plain and simple."  Exhibit 4.
9  　　　　Using her business judgment as a director of Cardinal Square, Guiahi believes that
10 the corporation's interests are absolutely *not* served by entering Arizona's recreational
11 marijuana market with Wang as a director, given the risk of criminal activity and lack of
12 necessary governance under ADHS for the licensed entity to survive.
13 　　　　On June 20, 2020, approximately one month after Wang's attempt to import
14 cannabis seeds across state lines, Guiahi resigned as CFO of The Pharm.  Her resignation
15 letter is Exhibit 5.  Her resignation flowed from being drawn into drug trafficking, along
16 with multiple violations of sound corporate governance, fiduciary duties and violations of
17 state and federal law. Guiahi was disappointed because she had single-handedly
18 restructured and turned around The Pharm from the brink of bankruptcy. Guiahi never
19 resigned as a director of Cardinal Square—a completely separate non-profit entity.
20 **II.     Cardinal Square bears a heavy burden to show entitlement to a TRO.**
21 　　　　This Court's February 22 Order distinguished this TRO request from any later
22 request for a preliminary injunction; the Court invited Cardinal Square to re-urge its
23 application for a TRO in light of federal law.  In the guise of re-urging its TRO request,
24 Cardinal Square has conflated that with a preliminary injunction, while significantly
25 expanding the scope and nature of its requested relief.  While the same equitable
26 standards govern the issuance of TROs and preliminary injunctions, they are different

remedies attended by different procedures. "The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while the purpose of a [TRO] is to preserve the status quo before a preliminary injunction hearing may be held." *Ariz. Recovery Hous. Ass'n v. Ariz. Dep't of Health Services*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020) (quotation omitted).

Unlike a TRO, a preliminary injunction requires an actual hearing that delves much deeper into the merits. This difference is accentuated because Cardinal Square seeks merits relief that heads in so many divergent directions (declaratory relief, specific performance, involuntary removal for fraud, allegations of extortion, etc.).  All that is at issue right now is the TRO request, and that is all the Court should consider at this point.[1]

A TRO is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).  To obtain a TRO, a party must show that he is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence in the preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (quoting *Winter*, 555 U.S. at 20).  "If the party is not quite able to show a likelihood of success on the merits, but is able to raise at least 'serious questions going to the merits' it may still be entitled to preliminary relief provided it can show that 'the balance of hardships . . . sharply'" in its favor, that [a TRO] will do more good than harm, and is in the public interest." *Ariz. Recovery Hous. Ass'n*, 462 F. Supp. 3d at 997 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

---

[1] Guiahi is a full-time resident of New York, and has not even been served with process. Thus far, Cardinal Square's entire evidentiary showing consists of the verification form signed by Laura Bianchi.  If the Court were to set a preliminary injunction hearing on a schedule that effectively prohibits discovery, the Court should order that Cardinal Square promise to produce its other director (Michael Wang) and attorney/complaint-verifier (Laura Bianchi) at the hearing for cross-examination.

Under either formulation, Plaintiff bears the heavy burden of satisfying all prongs of the *Winter* test. *Alliance for the Wild Rockies,* 632 F.3d at 1135. A TRO should not be granted in any event unless "the movant, ***by a clear showing***, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original).

### III.   Cardinal Square is not entitled to any sort of injunctive relief.

#### A.   Cardinal Square's claim that Guiahi is not a director lacks any merit.

Cardinal Square's requested TRO seeks to prohibit Guiahi from "falsely claiming to the Arizona Department of Health Services ("ADHS") that she is a director and officer of the company."[2] The TRO application thus turns on a question of fact—whether Guiahi is a director of Cardinal Square.

#### 1.   ADHS correctly determined that Guiahi is a director.

Acting within the scope of its regulatory authority, ADHS has already determined that Guiahi is a director of Cardinal Square. ADHS has responsibility for regulating Arizona's medical and recreational marijuana programs. *See generally* A.R.S. §§ 36-2801, -2850, *et seq*. The TRO is being sought as a collateral attack on that ADHS decision. Arizona law (which governs in this diversity case) forecloses this strategy.

ADHS regulations require the application for a recreational marijuana license to include (among other things) the signatures of all corporate directors. A.A.C. R9-18-303(E)(1). In January 2021, Cardinal Square submitted an application to ADHS for a recreational marijuana license. When ADHS noticed that Guiahi's signature was missing, ADHS was required to determine whether Guiahi is a director of Cardinal Square.

With respect to its marijuana programs, ADHS uses private outside counsel in lieu of the Arizona Attorney General's Office. Counsel for ADHS explained the agency's

---

[2] Cardinal Square frames its requested relief in terms of Guiahi's status as a "director or officer," presumably because ADHS uses a single attestation to cover both categories. The actual dispute, however, has focused on Guiahi's status as a director, and Guiahi will use that term alone.

1  initial determination in an email on January 19, 2021: "According to my review above, I
2  would conclude that Cardinal Square has two directors, Wang and Guiahi." Exhibit 6.
3       As a deliberate tactical choice, Cardinal Square abandoned any attempt to
4  persuade ADHS to make a different determination. It instead advised ADHS that it
5  "hereby waives and foregoes" its right to submit additional evidentiary materials. Exhibit
6  7. In essence, Cardinal Square volunteered to lose: it urged ADHS to "quickly issue a
7  notice of denial so that [Cardinal Square] can pursue alternative remedies." *Id.*
8       ADHS thus issued a formal decision denying Cardinal Square's application on
9  February 11, 2021. As the basis for denial, ADHS found that Cardinal Square's
10 application "was not signed by Mina Guiahi." *Id.*
11      Cardinal Square had the legal right (and actually still has the right) to request a
12 hearing if it wants to persuade ADHS to change its mind. The February 11 decision
13 advised Cardinal Square that it had 30 days to request a hearing. *See id.*; A.R.S. § 36-
14 2854(B)(1) (ADHS decision denying application for recreational marijuana license is
15 subject to administrative hearing and review)
16      But Cardinal Square lacks the courage of its convictions. Cardinal Square elected
17 not to exhaust its administrative remedies, and chose instead to file this civil lawsuit
18 against Guiahi. Cardinal Square wants this Court to sign an Order that, in effect,
19 overturns ADHS's decision of February 11, 2021.
20      Under Circuit precedent, this Court must apply Arizona law in evaluating the
21 preclusive effect of the ADHS decision and, likewise, the permissibility of this collateral
22 attack. *Olson v. Morris*, 188 F.3d 1083 (9th Cir. 1999) (district court must apply state law
23 in determining preclusive effect of facts found by state agency). Not surprisingly,
24 Arizona law requires exhaustion of administrative remedies, and forbids attempts to
25 circumvent the prescribed avenues of administrative review. As the Ninth Circuit put it:
26 "Under Arizona law, a party's failure to appeal a final administrative decision makes that

decision final and res judicata." *Id*. at 1086.  "In Arizona, the failure to seek judicial review of an administrative order precludes collateral attack of the order in a separate complaint." *Id.*  Recent precedent from this District has underscored this view.  *Gorney v. Ariz. Board of Regents*, 43 F. Supp. 3d 946 (D. Ariz. 2014) (according preclusive effect to decision of Arizona administrative agency).

The final decision of ADHS is clearly conclusive under Arizona law.  *Mullenaux v. Graham County*, 82 P.3d 362 (Ariz. App. 2004) (when terminated employee declined to request hearing under County's administrative process, initial decision became final and employee could not challenge that decision by filing separate lawsuit); *Guertin v. Pinal County*, 175 P.2d 843 (App. 1994) (when employee elected not to pursue an appeal of initial administrative decision, that decision was preclusive and employee could not pursue collateral attack in court).

As an alternative to formal issue preclusion—and at a minimum—this Court must defer to ADHS's factual finding.  Simply put, the factual findings of ADHS are final. *JH2K I, LLC v. Ariz. Dep't of Health Svcs*., 438 P.3d 676 (Ariz. App. 2019) (court will not disturb factual finding made by ADHS in denying medical marijuana license).

Cardinal Square's TRO application fails at square one.  Cardinal Square cannot seek to enjoin Guiahi from "revealing" to ADHS that she is a director when ADHS has already determined that very fact.

**2.    Guiahi never resigned as a director of Cardinal Square.**

Cardinal Square's application also fails at square two.  Most of Cardinal Square's case rests on its claim that Guiahi resigned as a director by letter dated June 20, 2020. Doc. 1, Ex. A (Complaint) at ¶¶ 33 & 34.  Cardinal Square appended Guiahi's putative "resignation letter" as exhibit E to its complaint—except it redacted everything except the first sentence. The *only* sentence Cardinal Square wants the Court to see is the first one, which says "I resign." Paragraph 34 of the Complaint necessarily implies that this was a

resignation *from the board of Cardinal Square*. The original TRO application states that Guiahi "submitted her immediate resignation from The Pharm *and its affiliates (including Cardinal)*" (Cardinal Square is not an affiliate of The Pharm). Doc. 2 at 7:20-22.

But the unredacted letter eviscerates these contentions. Guiahi only resigned from *The Pharm*, not from Cardinal Square. The letter is addressed to "The Pharm." Cardinal Square is not mentioned even once. And *all* of the text that Cardinal Square wanted to hide from the Court discusses Wang's improper conduct at The Pharm, not Cardinal Square. The Court should review the unredacted letter for itself at Exhibit 5.

The unredacted letter also shreds Cardinal Square's claim that it "understood" Guiahi's resignation to be from her positions at The Pharm *and* Cardinal Square. Doc 2 at 8:14-16. This self-serving "understanding" is baseless—no reasonable person would "understand" the unredacted letter to be Guiahi's resignation from Cardinal Square.

Credibility and candor are critical in the context of a request for extraordinary injunctive relief. Cardinal Square has forfeited its credibility by redacting Guiahi's letter in a way that is neither necessary nor fair. To be blunt, Cardinal Square tried to hide the facts.[3] The redactions sought to portray the letter as something it is not, while simultaneously covering up the possibly-criminal conduct of Michael Wang.

Worse, in the summer of 2020 the Arizona Attorney General's Office rebuked Cardinal Square for doing the same thing—treating The Pharm and Cardinal Square as the same entity. Exhibit 8. Cardinal Square attempted to remove Guiahi as a Director without her consent. In early August 2020, Guiahi explained to ADHS that she had resigned from The Pharm—but not from Cardinal Square. ADHS analyzed the Bylaws and documents that purported to remove Guiahi. On August 27th, 2020, the Attorney General's office reinstated Guiahi as a board member, stating: "In addition, a change to

---

[3] The complaint is further undercut by the identity of the person who verified—not Wang, but Laura Bianchi.

Mina Guiahi's PO/BM status needs to be evidenced by signed writings from all parties, in accordance with bylaws." By urging the Court to rely on this heavily-redacted "resignation letter," Cardinal Square has doubled down on a pattern of deceit.

Moreover, the June 20 letter does not satisfy the requirements for a valid resignation under either the Bylaws or A.R.S. § 10-3807. Section 6.10 of the Bylaws requires a director's resignation to be directed "*to the corporation* at its known principal place of business." The letter was directed to The Pharm, not Cardinal Square. Likewise, the Arizona statute that governs the resignation of directors, A.R.S. § 10-3807, requires that any resignation must be accomplished by actual delivery of "written notice" to the corporation in question. Notice was given to The Pharm, not Cardinal Square.

As a last-ditch argument, Cardinal Square invents a doctrine it calls "constructive resignation," citing case law that says ordinary employees can quit their jobs informally. But directors are not ordinary employees. The Bylaws and A.R.S. § 10-3807 do not apply to ordinary employees—but they do set bright-line rules for the resignation of directors. A.R.S. § 10-3807 requires an actual resignation, and Section 6.1 of the Bylaws says that a director remains in office "until he or she resigns or is removed from office pursuant to the provisions herein." ADHS was right to reject Cardinal Square's arguments, and this Court should follow suit.

### 3. Guiahi could not be removed (and was not removed) as a director.

The complaint then alleges that Cardinal Square's two-member board of directors (of which Guiahi was one member) removed Guiahi on December 8, 2020. ADHS rejected this argument because it is inconsistent with basic principles of corporate law, and this Court should not overturn that finding.

It is elementary that the powers of corporate directors are vested in the directors "not individually but as a board." 2 *Fletcher Cyc. Corp.* § 392 (2021). In other words, a board can only act *as a board*, not as individual directors. For exactly this reason,

Arizona law requires the board of a nonprofit corporation to act by a *majority vote*. A.R.S. § 10-3824(D).  Two-member boards require unanimity to take action, for the simple reason that one is not a majority of two.

Cardinal Square's Bylaws are in accord with these basic principles:

- Section 1.4 provides that Cardinal Square "shall be managed, controlled and governed by a *Board of Directors* (sometimes *collectively* referred to herein as the 'Directors' and *individually* as a 'Director')" (emphasis added).
- Section 6.1 reiterates that Cardinal Square is managed and controlled by *the Board:*  "The Corporation shall be managed, governed, operated and controlled *by the Board of Directors*" (emphasis added).
- Section 6.2 states that all directors discharge their duties as a "mutual and shared responsibility."
- Section 6.4 requires the Board to "consist of not less than two (2) Directors."
- Section 6.5 authorizes *the Board* to act: "The *Board of Directors* shall have the authority to act on behalf of the Corporation, take any actions necessary, and/or execute any document, contract or agreement, as deemed necessary, pursuant to the terms, covenants, and requirements of these Bylaws" (emphasis added).
- The very next sentence of Section 6.5 then states:  "Unless otherwise excepted herein, if the Corporation has greater than two (2) Directors, all such actions shall require the consent and approval *of a majority of the Directors then serving*" (emphasis added).

These provisions collectively yield three conclusions:  (1) the Board is a collective of all serving directors, (2) only the Board—acting as a body—can act for the company, and (3) a less-than-unanimous Board may act only if it has more than two directors.

Wang purported to remove Guiahi as a director of Cardinal Square under Section 6.9 of the Bylaws, which states:  "***The Board of Directors*** shall have the authority to

11

remove *a Director* for cause or without cause, pursuant to the consent and approval of ***the Directors then serving***" (emphasis added).  But Wang, as a sole director, has no power to act on behalf of *the Board*.  Consistent with the rest of the Bylaws, Section 6.9 vests the power of removal in *the Board*, not in any particular director.  The power of the Board is not vested in Wang, and Wang may not unilaterally act as the Board for any purpose.

For all these reasons, ADHS gave no credit to the resolutions cited in the complaint.  To the contrary, ADHS concluded that "Wang alone cannot remove Guiahi as a director without her consent." Exhibit 6.  In its February 11, 2021 decision, ADHS denied Cardinal Square's application because it "was not signed by Mina Guiahi." Exhibit 7.  ADHS was absolutely correct—the "resolution" removing Guiahi as a director was not a valid action and violates the Bylaws and basic principles of corporate law.

Cardinal Square's counterarguments are unavailing.  It first contends that Section 6.5 requires a majority vote only if there are more than two directors.  But this violates the majority-vote requirement of A.R.S. § 10-3824(D).  And nothing in the Bylaws vests the Board's power in a single director or purports to allow action with *less* than a majority of directors.  Although Cardinal Square worries about a deadlock in this situation, Title 10 includes statutory provisions for dealing with a corporate deadlock.  Further, one director may sue for judicial removal of the other director under § 10-3810.

Second, Cardinal Square cites Section 6.6, which requires unanimous consent of the directors for certain actions, such as dissolution.  Cardinal Square argues that Wang could remove Guiahi because "removal of a director" is not listed in Section 6.6.  Not so.  Reading Section 6.6 together with the rest of the Bylaws, as the Court must, Section 6.6 means that (1) if there are two directors, they act collectively (*e.g.,* unanimous consent), (2) if there are *more* than two directors, a majority may act unless the action requires unanimous consent under Section 6.6.  Nothing about Section 6.6 allows Wang to unilaterally act for the Board.

Finally, Cardinal Square points to language that was allegedly stricken from the Bylaws, specifying that unanimous consent is required when the Board is made up of two directors. But the *absence* of this language cannot override Arizona law, basic principles of corporate law, or the rest of the Bylaws—under all these authorities, one director cannot exercise the powers of the Board. Cardinal Square points to nothing in the Bylaws that expressly authorizes one director to exercise the Board's power; it cites no legal authority holding that the majority-vote requirement of A.R.S. § 10-3824(D) is merely a suggestion.

Cardinal Square is essentially arguing that, when there is a two-person board, either director can do whatever they want. In addition to its inconsistency with A.R.S. § 10-3824(D), this position is absurd. What if one director signs a resolution approving a contract and the other signs a resolution disapproving it? Cardinal Square's argument violates all notions of sound corporate governance.

**B.     Guiahi's decision not to sign the attestation is protected by the business judgment rule, and an injunction does not lie to force her to exercise her judgment differently.**

Alternatively, Cardinal Square requests an order compelling Guiahi to sign the attestation for the recreational marijuana license. This request runs headlong into—and is barred by—the business judgment rule.

The business judgment rule bars "judicial inquiry into actions taken by a director in good faith and in the exercise of honest judgment in the legitimate and lawful furtherance of a corporate purpose." *Albers v. Edelson Tech. Partners L.P.,* 31 P.3d 821, 828 (Ariz. App. 2001). There is a "presumption" that directors of a corporation act in good faith and in the honest belief that an action is in the company's best interest. *Best W. Int'l, Inc. v. Furber*, 2008 WL 2045701, at *4 (D. Ariz. May 12, 2008) (quotation omitted). Only a showing of "gross negligence" rebuts the presumption. *Id.*

In other words, Arizona law precludes judicial second-guessing of a director's decision, whether in the form of a damages award or an injunction compelling the director to make a different decision.  Corporate directors instead enjoy significant discretion to act or not act in a particular way, and a director loses this discretion only in the most extreme circumstances.  The business judgment rule would mean next to nothing if a party who is dissatisfied with a director's exercise of discretion could run to court and demand emergency equitable relief.

### C.     The alternative request for "judicial removal" of Guiahi is meritless.

With very rare exceptions, the selection and termination of corporate directors is handled without judicial proceedings. "Judicial removal of a director is an extraordinary remedy." 2 *Fletcher Cyc. Corp.* § 358 (2021).  Seeking this extraordinary remedy, the Complaint asks the court to remove Guiahi for "fraudulent conduct or intentional criminal conduct." A.R.S. § 10-3810(A).  Fraud must be proven by clear and convincing evidence.  *Powers v. Guaranty RV, Inc*., 278 P.3d 333 (Ariz. App. 2012).

Under Fed. R. Civ. P. 9(b), and its Arizona analog, fraud must be pleaded with particularity.  The Complaint contains 129 paragraphs, but the only particular allegation of fraud is this:  on January 25, 2021, Guiahi told the Arizona Corporation Commission that she was a director.  Doc. 1, Ex. A (Complaint) at ¶¶ 66-69.

But on January 19, 2021—six days before Guiahi said anything to the Corporation Commission—ADHS concluded that Guiahi was a director of Cardinal Square.  Exhibit 6.  ***So Guiahi's alleged "fraud" consisted of telling the Arizona Corporation Commission what ADHS had just concluded!***  Telling one agency about the conclusion of another agency is not a plausible allegation of fraud under the *Iqbal* standard.  It falls absurdly short of the "clear and convincing evidence" standard required by Arizona law.

Moreover, the "removal for fraud" claim adds nothing to the complaint—it cannot possibly make a difference in the outcome—because it necessarily stands or falls with the

allegations that Guiahi resigned or was removed prior to January 25, 2021.  Put differently, the request for judicial removal could have merit only if Guiahi had *already* ceased to be a Director as of January 25; and if that is correct, then the request for judicial removal is moot.  On the other hand, if Guiahi *was* still a Director on January 25 (as ADHS concluded), then there could be nothing "fraudulent" in her saying so to the Corporation Commission.

### D. Cardinal Square cannot clearly establish the other three factors.

*Irreparable Harm:*  "Irreparable harm is harm for which there is no adequate legal remedy, such as an award for damages." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020).  Economic harms do not generally qualify as irreparable, as such harms are quantifiable and reducible to an award of damages. *Id.*

The harms Cardinal Square articulates are all quantifiable and reducible to a damages award (in the unlikely event, of course, that Cardinal Square proves Guiahi is actually liable for these damages).  There is no irreparable harm, and thus no injunction can issue.  All Cardinal Square can do to evade this obvious conclusion is make unsubstantiated statements that (1) its economic damages are in the tens of millions of dollars and (2) Guiahi could never satisfy such a judgment.  If this was enough to show irreparable harm, injunctive relief would no longer be an extraordinary remedy.[4]

*Balance of Hardships/Public Policy*:  ADHS already knows that Guiahi is a director of Cardinal Square; it has so decided twice.  ADHS also knows that it just denied Cardinal Square's application, and that Cardinal Square has filed this litigation.  The marijuana industry is heavily regulated, and ADHS has an obvious interest in communicating with those it regulates.  And not least, Guiahi's right to speak with the

---

[4] Granting the TRO also may not even alleviate the harm Cardinal Square claims.  ADHS has already determined that Guiahi is a director.  Barring Guiahi from stating she is a director does not *bind* ADHS or preclude ADHS from requiring Guiahi's signature.

1  government is protected by the First Amendment.  *See E. R.R. Presidents Conference v.*
2  *Noerr Motor Freight, Inc.*, 365 U.S. 127, 138-40 (1961); *Franchise Realty Interstate*
3  *Corp. v. S.F. Local Joint Executive Bd.*, 542 F.2d 1076, 1082 (9th Cir. 1976).
4        Amidst all that, Cardinal Square seeks a TRO banning speech—prohibiting Guiahi
5  from "asserting" the very fact that ADHS itself has determined to be true.  A TRO
6  prohibiting communication with a government regulatory agency is probably
7  unconstitutional, and problematic at the least.  Public policy certainly does not favor gag
8  orders on individuals who have business with government agencies.
9        Nor does public policy favor courts becoming embroiled in the internal affairs of
10 corporations.  The Court should be chary to assume the role of a "super director" and
11 second-guess Guiahi's exercise of her discretion on a matter of business judgment, just as
12 it would not assume the role of a "super agency" and second-guess an agency's decision
13 on issues within its expertise.  *See DeGroot v. Ariz. Racing Comm'n*, 686 P.2d 1301,
14 1305–06 (Ariz. App. 1984).

15 **IV.    The complaint lacks the credibility required to support emergency relief.**

16       Cardinal Square has tied its entire case to the verification of its complaint.  When a
17 complaint is verified, that verification (at least in theory) transmutes the pleading into
18 evidence.  Here, the complaint was verified by Bianchi, who explains that she can verify
19 the entire Complaint because she routinely communicated with Guiahi while she was
20 CFO of The Pharm.
21       One might ask how any attorney who has read the unredacted version of the June
22 20, 2020 letter could "verify" that it constituted a resignation from Cardinal Square.  But
23 the problem runs deeper.  The communications that supply the basis for the verification
24 include an acknowledgement by Bianchi that she regularly prepared false board minutes
25 and board consents for clients that did not observe corporate formality.  Attached as
26 Exhibit 9 are text messages between Guiahi and Bianchi.  Their exchange went like this:

Guiahi asked Bianchi to hold off on preparing minutes of Board meetings, in order to first ascertain if there had been any actual Board meetings in a significant litigation matter Guiahi was working on with Bianchi when she was the CFO of The Pharm in February 2020.  Guiahi said: "Let's not do minutes until see if we actually had a mtg. sounds like maybe we did not"

Bianchi's response implied that minutes of the meeting could be prepared even if there was no meeting:

> "Whatever you would like but again from my perspective you've gone [should be "done"] all you're supposed to so your records are complete. Doesn't have to be now, but you will want these things on file for future. All clean up stuff though and we can address anytime."

In a subsequent exchange Guiahi asked about the preparation of minutes of a board meeting when "Lovell [a former employee of The Pharm] saying we never had a board mtg."

Bianchi responded that she routinely prepares minutes of board meetings that never happened:

> "We can prepare anything I just don't want to waste time and fees :) Totally agree on all counts though!"

> "Really don't even waste time it's not necessary *I do this all the time for clients, we prepare board minutes and Simple resolution that will meet the legal requirements.  Guarantee never use board meetings :)*" (emphasis added).

## V.     Conclusion

Cardinal Square is seeking extraordinary relief to overturn the factual finding of a state regulatory agency, based on a "verified" complaint that is pervaded with deceit, so that the Court will give a drug trafficker a green light to participate in Arizona's recreational marijuana program.

The Court should deny Cardinal Square's application for equitable relief.

DATED this 25th day of February, 2021.

                                        GAMMAGE & BURNHAM, PLC

                                        By s/ Cameron C. Artigue
                                             Cameron C. Artigue
                                             Christopher L. Hering
                                             40 North Central Avenue, 20th Floor
                                             Phoenix, Arizona  85004
                                             *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that February 25, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Keith Beauchamp
Roopali H. Desai
Marvin C. Ruth
Coppersmith Brockelman PLC
2800 N. Central Avenue, Suite 1900
Phoenix, AZ 85004
kbeauchamp@cblawyers.com
rdesai@cblawyers.com
mruth@cblawyers.com
*Attorneys for Plaintiff*

s/   Nina J. Camou