**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cardinal Square Incorporated,<br><br>   Plaintiff,<br><br>v.<br><br>Mina Guiahi,<br><br>   Defendant. | No. CV-21-00314-PHX-JAT<br><br>**ORDER** |

  Pending before the Court is Plaintiff Cardinal Square Incorporated's Motion for Temporary Restraining Order (Doc. 2). The motion is fully briefed (Doc. 9; Doc. 10; Doc. 12; Doc. 15), and the Court held oral argument on the motion on Wednesday, March 3, 2021. The Court now rules.

**I. BACKGROUND**

  This case presents a corporate dispute related to Arizona's budding recreational marijuana industry. Cardinal currently holds a license to cultivate and sell medical marijuana under the Arizona Medical Marijuana Act. It is presently striving to acquire a license from the Arizona Department of Health Services (ADHS) to sell marijuana for recreational consumption as well. And the clock is ticking. The deadline for Cardinal to apply for such a license is March 9, 2021. If Cardinal blows that deadline, its right to a license goes up in smoke.

  Seemingly, the only obstacle in Cardinal's path is Defendant Mina Guiahi, one of Cardinal's board members—though the parties disagree as to whether she is actually a

board member. Guiahi is withholding her consent to submit the application, which is required under Arizona law. Guiahi claims she is doing so because her fellow board member, Michael Wang, has been involved in criminal activities (aside from generally operating a business prohibited by federal law), and these activities put Cardinal's future in jeopardy. Cardinal claims Guiahi is actually withholding her consent because she wants a personal payoff, in violation of Arizona's corporate and criminal law.

After failed attempts at a resolution between the parties, before ADHS, and briefly before the Maricopa County Superior Court, this sordid tale now finds itself before this Court on diversity jurisdiction. Cardinal now seeks a temporary restraining order (TRO) enjoining Guiahi from preventing it from acquiring the license it seeks. For reasons that follow, the Court will deny the motion in part. The Court will resolve the remaining issues following a preliminary injunction hearing.

### a.  Regulatory Background

In the November 3, 2020 general election, Arizona voters approved Proposition 207, known as the Smart and Safe Arizona Act. Now codified as Arizona's Responsible Adult Use of Marijuana laws, the new state laws allow adults age 21 and over to consume marijuana recreationally. *See* A.R.S. §§ 36-2850 to -2865.

The laws and related regulations also create a system for licensing "marijuana establishments," which are entities licensed by ADHS to operate a single marijuana retail location; an off-site cultivation location; and an off-site facility for manufacturing, packaging, and storing marijuana products. A.R.S. § 36-2850(18)(a)–(c). The laws, however, limit the number of such licenses ADHS may issue, tying the maximum number of marijuana establishment licenses to the number of registered pharmacies in Arizona. *See* A.R.S. § 36-2854(A)(1)(b). ADHS may issue no more than one marijuana establishment license for every ten registered pharmacies in the State. *Id.* Perhaps unsurprisingly, a limited license to sell marijuana to adults for recreational use is rather valuable; Cardinal asserts it is worth "tens of millions" of dollars. (Doc. 1-8 at 17).

Qualified early applicants, including "nonprofit medical marijuana

dispensar[ies] . . . registered and in good standing with [ADHS]," get first dibs at these licenses, and the parties do not dispute that Cardinal meets this requirement. A.R.S. § 36-2850(10)(b). Early applicants must submit an application for a marijuana establishment license by March 9, 2021. A.R.S. § 36-2854(A)(1)(d). And the law provides that ADHS "shall issue a marijuana establishment license to each qualified early applicant." *Id.*[1]

The Arizona Administrative Code provides the required elements of a marijuana establishment license application. *See* A.A.C. R9-18-303. Among them is the requirement that the application include "[a]n attestation from each principal officer and each board member approving the application for a marijuana establishment license." A.A.C. R9-18-303(C)(1).

### b. Factual Background[2]

Cardinal is an Arizona nonprofit corporation with no members. (Doc. 1-3 at 36, 38). As of February 21, 2020, Cardinal had two board members and principal officers, Guiahi (Vice-President) and Wang (President). (*Id.* at 35). Prior to her appointment to Cardinal's board, Guiahi served as the chief financial officer of The Pharm, a for-profit cannabis-centered Delaware corporation. (Doc. 10 at 2). At the time, Wang served as The Pharm's chief operating officer and co-chief executive officer. (*Id.*).

On June 8, 2020, Guiahi received a letter on behalf of the Pharm's board of directors informing her that the board decided to "temporarily transition to others [her] primary day-to-day responsibilities with the company and its affiliates and subsidiaries." (Doc. 1-4 at 2). In response, Guiahi sent a letter to the Pharm's board on June 20, 2020, which she described as her "immediate resignation." (*Id.* at 4). Her letter stated that Guiahi believed she was being constructively discharged for raising concerns regarding the illegal conduct of others within the company. (Doc. 10-1 at 50). About a month prior, Guiahi alleges she

---

[1] If additional licenses remain after ADHS issues early applicants licenses, the remainder are to be awarded by random selection. A.R.S. § 36-2854(A)(1)(e). And ADHS must also issue 26 additional licenses under a yet-to-be-defined "social equity ownership program." A.R.S. § 36-2854(A)(1)(f). Neither the random selection nor social equity systems are relevant to the issues here.

[2] To provide context, the Court derives some background facts from uncontested (or not-yet-contested) allegations in the complaint and statements in the parties' filings.

refused Wang's request to approve a transaction involving the interstate shipment of marijuana seeds. (Doc. 10 at 3).

Following Guiahi's letter, Cardinal emailed her on three separate occasions requesting that she sign resignation documents related to her position at Cardinal, to which Guiahi did not respond. (Doc. 1-4 at 11–19). On July 14, 2020, Cardinal, through Wang's vote alone, adopted a resolution accepting what it interpreted to be Guiahi's resignation from Cardinal's board, replacing her with another member, and adopting new bylaws. (Doc. 1-4 at 6–7). Cardinal subsequently informed the Arizona Corporation Commission (ACC) of its resolution, and the ACC removed Guiahi from Cardinal's publicly available records. (Doc. 1-3 at 13). On August 4, 2020, Cardinal informed ADHS that its directors changed consistent with its July 2020 resolution. (Doc. 1-4 at 21–22).

Sometime after ADHS accepted Cardinal's change of officers, Guiahi contacted ADHS and informed the department that she had not resigned from her position on Cardinal's board. (Doc. 1-3 at 15). On November 2, 2020, Cardinal again sent Guiahi an email requesting her resignation (Doc. 1-5 at 15), and Guiahi did not respond. On December 1, 2020, Cardinal's counsel emailed Guiahi's counsel to request Guiahi sign a board resolution allowing Cardinal to relocate its dispensary. (*See* Doc. 1-3 at 15; Doc. 12-1 at 12).

A phone call between Cardinal's and Guiahi's counsel followed, the substance of which is hotly disputed. Cardinal alleges Guiahi "refused to sign the resolution[;] [i]nstead, through counsel, she demanded $1,000,000 to buy her cooperation." (Doc. 1-3 at 15). This million-dollar demand was allegedly related to money Guiahi believed The Pharm still owed her. (*Id.* at 16). Guiahi's counsel characterizes the conversation as "a very friendly call and short call with someone [she] considered a colleague and a friend." (Doc. 12-1 at 2). Guiahi's counsel further asserts that although they generally discussed outstanding issues related to The Pharm, she "never told [Cardinal's counsel] that [Guiahi] was categorically refusing to sign documents" or "demanded any sort of payment from anybody for [Guiahi's] cooperation as a board member of Cardinal Square." (*Id.* at 3).

Following this discussion, Wang executed another resolution on December 8, 2020, removing Guiahi from her role as a board member and officer of Cardinal for cause. (Doc. 1-5 at 21–22). The resolution stated that "Guiahi violated her fiduciary obligations to the Corporation by attempting to leverage a financial settlement only for Guiahi's personal benefit . . . ." (*Id.* at 21). Cardinal also sent a letter to ADHS informing the department that Guiahi had been removed for cause. (*Id.* at 20).

On January 25, 2021, Cardinal sent Guiahi's counsel an email requesting that Guiahi sign forms required for Cardinal to obtain a marijuana establishment license. (Doc. 1-7 at 11–12). Guiahi did not respond. That same day, the ACC received a document signed by Guiahi re-adding herself as an officer of Cardinal. (*Id.* at 16).

Cardinal proceeded to apply for a marijuana establishment license without Guiahi's authorization, which ADHS denied on February 11, 2021. (Doc. 1-8 at 6–7). ADHS held an informal settlement conference between Cardinal and Guiahi on February 17, 2021, but the parties did not reach an agreement. (*See* Doc. 1-3 at 21). On February 19, 2021, Cardinal filed the instant case in the Maricopa County Superior Court and sought a TRO. (*Id.* at 8). Guiahi timely removed the case to this Court on February 22, 2021. (Doc. 1).

## II.   LEGAL STANDARD

For a court to issue a TRO or preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the Ninth Circuit "serious questions" test, the four *Winter* factors may be evaluated on a sliding scale, and a TRO or preliminary injunction "is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*)).

## III. DISCUSSION

### a. Equitable Factors

Cardinal argues that the likelihood of irreparable harm, balance of equities, and public interest factors tip sharply in its favor, so the Court should consider whether serious questions exist regarding the merits of its claims, rather than a strong likelihood of success on the merits. The Court agrees.

#### 1. Likelihood of Irreparable Harm

First, Cardinal has demonstrated a strong likelihood of irreparable harm if relief is denied. As discussed above, the number of marijuana establishment licenses ADHS may issue, and the period during which Cardinal may apply for such a license, are restricted by law. Although it is unclear on the record presently before the Court exactly how much a marijuana establishment license is worth, the fact that it is extremely valuable is beyond legitimate dispute.

Further, assuming Cardinal is a qualified early applicant, Cardinal has a statutory right to a license if it submits a complete application to ADHS by March 9, 2021. If Cardinal is unable to submit its application by March 9, it loses that entitlement. At that point, assuming ADHS issues additional licenses, Cardinal's only chance to enter the market would be to apply to receive a license through Arizona's random selection system.

Guiahi argues that Cardinal is not facing irreparable harm because "economic harm is not generally considered irreparable," *see E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020), and Cardinal's potential harms "are all quantifiable and reducible to a damages award" (Doc. 10 at 15). Cardinal's potential harm here, however, is not as simple as a loss of income. If Cardinal cannot submit a complete application by March 9, it is unlikely Cardinal will be able to enter the recreational marijuana market at all. Much like a business that derives its income from gambling, an otherwise illegal enterprise requiring a specific state license, a marijuana establishment license may well be critical to Cardinal's ability to compete in a rapidly changing and heavily regulated

marketplace.³ *See TP Racing, L.L.L.P. v. Simms*, No. 1 CA-CV 14-0348, 2016 WL 423803, at *5 (Ariz. Ct. App. Feb. 4, 2016) (finding that "the loss of a permit essential to [a horse-racing facility's] operations" constituted "a significant threat of irreparable harm").

Moreover, depending on the income Cardinal stands to lose, it may end up being unable to actually collect a money judgment from Guiahi. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990) ("[T]he unsatisfiability of a money judgment can constitute irreparable injury[.]").

Accordingly, the Court finds that Cardinal is likely to suffer irreparable harm in the absence of this Court's intervention.

## 2. Balance of Equities

Second, Cardinal also demonstrates that the balance of equities tip sharply in its favor. Cardinal is facing the potential loss of a marijuana establishment license, and regardless of whether Guiahi ultimately prevails, granting Cardinal's TRO will cause Guiahi no harm.

Put simply, if Guiahi prevails and remains a member of Cardinal's board, Cardinal in the meantime would have acquired a license that substantially increases the value of the business. Although Guiahi asserts that acquiring this license would put the company in jeopardy by allowing Wang to violate the law and lead to the company's demise, avenues exist under both Cardinal's bylaws and Arizona corporate law for her to challenge Wang's actions. If Cardinal prevails and Guiahi does not remain a member of Cardinal's board, it would be inequitable to allow her to deprive Cardinal of the opportunity to acquire the license.

Guiahi's argument to the contrary is unpersuasive. Primarily, she argues that an injunction preventing her from communicating with ADHS would violate her First

---

³ The Court, however, is unpersuaded by Cardinal's argument that obtaining a marijuana establishment license "is the sole purpose of the entity" or that its failure to acquire the license will cause it to go out of business. (Doc. 2 at 17). This statement is inconsistent with Cardinal's own bylaws, which describe Cardinal's purpose as providing marijuana products and related services within the scope of the Arizona Medical Marijuana Act, rather than the then-nonexistent Responsible Adult Use of Marijuana laws. (Doc. 1-3 at 38).

- 7 -

Amendment right to speak with the government. (Doc. 10 at 15–16). Because the Court is not issuing such an injunction, Guiahi's argument on this point is inapposite.

### 3. Public Interest

The public interest at issue here also favors Cardinal. By approving Proposition 207 in the November 2020 general election, Arizona voters approved a set of laws under which existing medical marijuana license holders have priority access to marijuana establishment licenses. To the extent Cardinal is a qualified early applicant, public policy favors its ability to acquire the license.

In sum, because the three factors discussed above weigh strongly in Cardinal's favor, the Court considers whether serious questions exist regarding the merits of its claims, rather than a strong likelihood of success on the merits.

### b. Serious Questions Going to the Merits

Cardinal's complaint raises several causes of action that Cardinal argues would justify the relief it seeks. Specifically, Cardinal argues that Guiahi is no longer an officer or member of the board because she either resigned her position or was removed by Cardinal resolutions. (Doc. 1-3 at 24–25). Alternatively, Cardinal argues that if Guiahi is still a member of the board, she breached Cardinal's bylaws and her fiduciary duty to Cardinal and should be removed from her position with Cardinal for engaging in illegal conduct. (*Id.* at 25–27). The Court addresses each in turn.[4]

### 1. Resignation and Abandonment Theories

First, the Court does not find a serious question as to whether Guiahi resigned or abandoned her position on the board.

On June 8, 2020, a representative of The Pharm board sent Guiahi a letter informing

---

[4] Guiahi argues that this Court may not consider whether Guiahi continues to be a member of Cardinal's board because Cardinal has not exhausted its administrative remedies with ADHS. Because the Court, conducting an independent review, agrees with ADHS that Guiahi continues to be a member of Cardinal's board, the Court need not address this issue. Concerning Cardinal's remaining claims (breach of contract, breach of fiduciary duty, and judicial removal), under the circumstances of this case, the Court disagrees that Cardinal was required to present these issues to ADHS. *See Univar Corp. v. City of Phoenix*, 122 Ariz. 220, 224, 594 P.2d 86, 90 (1979) (noting that the "exhaustion of remedies rule should not be summarily applied under . . . circumstances . . . in which the agency's expertise is unnecessary[] or in which irreparable harm will be caused if the rule is followed.").

her that the board decided to "temporarily transition to others [her] primary day-to-day responsibilities with the company and its affiliates and subsidiaries." (Doc. 1-4 at 2). Cardinal cites a heavily redacted version of the letter Guiahi sent The Pharm board in response, which states, "In response to [the] June 8th letter entitled 'Transition of Responsibilities' . . . , please accept this letter as my immediate resignation." Because the scope of The Pharm board's letter included The Pharm's "affiliates and subsidiaries," and Cardinal is an affiliate of The Pharm (a fact Guiahi disputes), Cardinal argues that Guiahi's letter is a resignation from both The Pharm and Cardinal. Guiahi's unredacted letter, however, plainly does not indicate Guiahi's intent to resign from the Cardinal's board, nor does it comply with Cardinal's procedures for doing so.

Section 6.10 of Cardinal's bylaws[5] provides that "[a]ny Director may resign from his or her office, at any time by delivering written notice of his or her resignation, *to the Corporation*." (Doc. 1-3 at 41) (emphasis added). Guiahi's resignation is addressed to the board of The Pharm, not Cardinal. (Doc. 10-1 at 50). Further, the letter describes various grievances Guiahi had specifically with The Pharm's corporate governance. (*Id.*). It refers specifically to "the Company"—rather "than Companies" or "the Company and its affiliates"—and states a concern specifically for "owners and stakeholders of The Pharm."[6] (*Id.*).

Cardinal asserts it "understood Guiahi's 'immediate resignation' to include the unpaid board position she held at Cardinal only by virtue of her work for The Pharm." Cardinal further argues that it demonstrated this understanding by "sen[ding] three written communications to Guiahi in July asking that she sign . . . a resolution for Cardinal accepting her resignation and approving the appointment of a new director and officer," and "[Guiahi] never contested Cardinal's understanding that her resignation included

---

[5] Because they were the last bylaws approved by both of Cardinal's directors, the Court cites to the third amended bylaws. (Doc. 1-3 at 35-50).
[6] The Court is dismayed at Plaintiff's decision to redact Guiahi's letter in the way it did. It is difficult to see this decision as anything other than a conscious effort to distort the facts and lead the Court to issue a TRO or preliminary injunction without a complete understanding of the relevant circumstances. The Court expects more of the attorneys who practice before it, particularly under circumstances requiring a decision in the limited time frame presented here.

- 9 -

Cardinal." But the contents of her resignation letter to The Pharm and her refusal to sign a Cardinal-specific resignation resolution make clear that Guiahi had a different understanding. And as discussed below, Cardinal's bylaws set forth a specific procedure to remove a member of Cardinal's board. These procedures do not allow the board of The Pharm to remove Guiahi from her membership on the Cardinal's board. Although the parties' arguments before the Court made clear that there is certainly some level of involvement between The Pharm and Cardinal, the two remain distinct legal entities.

Cardinal also notes that Guiahi accepted a position with another New-York-based cannabis company and did not communicate with Cardinal until December 2020. But nothing in the record indicates that Guiahi was not allowed to take a position with another cannabis company while serving on Cardinal's Board or that Cardinal made any effort to communicate with Guiahi before December 2020 (other than to request her resignation). Accordingly, the Court does not find a substantial issue regarding whether Guiahi resigned her position on Cardinal's board.

### 2. Bylaw Removal Theory

Cardinal also argues that Guiahi is no longer a member of Cardinal's board because she was removed by two resolutions of Wang on behalf of Cardinal. (Doc. 2 at 9–14; Doc. 9 at 3). The Court disagrees.

A director of a nonprofit corporation "may be removed from office pursuant to any procedure provided in the articles of incorporation or bylaws." A.R.S. § 10-3808(A). Section 6.1 of Cardinal's bylaws provides that a director remains in office "until he or she resigns or is removed from office pursuant to the provisions [t]herein." (Doc. 1-3 at 39). Section 6.9 sets forth the procedure by which a Cardinal board member may be removed. It states that "[t]he Board of Directors shall have the authority to remove a Director *for cause* or without cause, pursuant to the consent and approval of the Directors then serving." (*Id.* at 40). Section 6.5 describes how the Board may act:

> Section 6.5   Director Consent. The Board of Directors shall have the authority to act on behalf of the Corporation, take any actions necessary, and/or execute any document, contract or agreement, as deemed necessary, pursuant to the terms,

> covenants and requirements of these Bylaws. Unless otherwise excepted herein, if the Corporation has greater than two (2) Directors, all such actions shall require the consent and approval of a majority of the Directors then serving.

(*Id.* at 39).

Cardinal and Guiahi offer two diametrically opposed views of what the bylaws require when Cardinal's board consists of only two members. Cardinal argues that "when Cardinal has two directors, no majority is required, and either director can act" (Doc. 2 at 11); Guiahi argues that "a less-than-unanimous Board may act only if it has more than two directors." (Doc. 10 at 11). The Court agrees with Guiahi's reading.

Cardinal's bylaws consistently refer to the board of directors as a collective. (*See, e.g.*, Doc. 1-3 at 35 ("The Corporation shall be managed, controlled and governed by a Board of Directors (sometimes collectively referred to herein as the 'Directors' and individually as a 'Director')"); *id* at 39 ("The Board of Directors shall have the authority to act on behalf of the Corporation . . . .")). And no provision anywhere in the bylaws permits less than a majority of the board to act on behalf of the board. It logically follows that when the board is composed of only two members, the support of both members is required to take an action on behalf of the board as a collective. An action by a single director can hardly be seen as an action of the two-member board, as one is not a majority of two. Accordingly, neither of Cardinal's resolutions authorized by Wang alone removing Guiahi from the board was valid, and Cardinal's arguments to the contrary are unpersuasive.

Because some provisions of the bylaws specifically require a unanimous or majority vote of the board to take certain actions, Cardinal argues the remaining actions–including removing a director–necessarily do not require a majority vote. (Doc. 2 at 11–13). For example, Section 6.6 of the bylaws requires unanimous consent of the board to "take any action which may in any way cause the Corporation to fail to be in compliance with the [Arizona Medical Marijuana Act]." (Doc. 1-3 at 39). Section 6.7 requires "the approval and consent of a majority of the Directors" to elect directors to serve on the board. (*Id.* at

39). Cardinal argues that requiring both board members' approval to remove a board member, which is not an action specifically set forth in Section 6.6 or specifically requiring a majority vote, would render other sections of the bylaws superfluous. (Doc. 2 at 11).

But the bylaws as written contemplate that the size of the board may change, (*see* Doc. 1-3 at 39 ("Section 6.4 . . . [T]he Board of Directors shall consist of not less than two (2) Directors and not more than nine (9) Directors.")), and are consequently written to apply regardless of the present size of the board. Requiring both members of a two-member board to act on behalf of Cardinal would not render other sections of the bylaws superfluous, but rather inapplicable under the Board's *current* structure. If Cardinal were to increase its board to more than two members, Sections like 6.6 and 6.7 serve the purpose of distinguishing circumstances under which a unanimous versus majority vote of the board is required. Accordingly, this reading of its bylaws would not render any terms superfluous, *see Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 158 (1993), meaningless, *see Tucker v. Byler*, 27 Ariz. App. 704, 707 (1976), or mere surplusage, *see Ohio Cas. Ins. Co. v. Henderson*, 189 Ariz. 184, 187 (1997).

Cardinal further argues that its removal of a provision from a previous version of its bylaws indicates its intent to require only one vote of a two-member board to act. Specifically, a previous version of Section 6.5 included a provision that stated, "if the Corporation has two (2) Directors, all actions shall require the unanimous consent and approval of the Directors then serving." (Doc. 9-1 at 6). Cardinal argues that "[b]y removing that provision, Cardinal articulated its clear intent to be free from the requirement that two directors must act unanimously . . . ." (Doc. 2 at 13). Even assuming this change in language weighs in Cardinal's favor (rather than merely removing an unnecessary clause from the bylaws), the Court does not find this *lack of language* sufficient to overcome the plain text of the bylaws requiring the board to act as a collective.

Finally, at oral argument, Cardinal argued that requiring the vote of both members of Cardinal's board would result in "perpetual deadlock." But it is not the role of this Court, through interim injunctive relief, to rescue the parties from the consequences of their less-

than-ideally-drafted bylaws or less-than-ideally-structured two-member board.

Because Cardinal fails to raise a substantial issue on either of its theories as to why Guiahi is no longer a member of Cardinal's board, the Count denies any requested relief related to these claims.

### 3. Specific Performance Theory

Next, Cardinal argues that Guiahi breached its bylaws and requests the Court order "specific performance" of "requir[ing] her to sign the attestation" form provided by ADHS. (Doc. 2 at 14–16). Because the Court determines that such a remedy is unavailable for Cardinal's claim, the Court declines to do so.

Under Arizona law, corporate bylaws may constitute a contract. *See Samaritan Health Sys. v. Superior Court*, 981 P.2d 584, 588 (Ariz. Ct. App. 1998) (holding that bylaws can constitute a contract); *Rowland v. Union Hills Country Club*, 757 P.2d 105, 108 (Ariz. Ct. App. 1988) ("The rights of members of a private organization are governed by the articles of incorporation and by-laws, which constitute a contract between the members and the organization, and among the members themselves."). Typically, specific performance requires five elements:

> (1) there must be a contract; (2) the terms of that contract must be certain and fair; (3) the party seeking specific performance must not have acted inequitably; (4) specific enforcement must not inflict hardship on the other party or public that outweighs the anticipated benefit to the party seeking specific performance; and (5) there must be no adequate remedy at law.

*The Power P.E.O., Inc. v. Emps. Ins. of Wausau*, 38 P.3d 1224, 1228 (Ariz. Ct. App. 2002).

Here, Cardinal alleges that Guiahi breached Section 6.2 of its bylaws, which requires directors to "perform whatever tasks and actions are necessary to ensure the Corporation's success and positive impact on the community, now and in the future." (Doc. 1-3 at 39). Because it believes[7] acquiring a marijuana establishment license is in its long-term best interest, Cardinal argues Guiahi is breaching this provision by refusing to take

---

[7] On this record, it would appear the "belief" of Cardinal being advanced by counsel is solely Wang's belief, and thus, may not ultimately prove to be a correct statement of Cardinal's belief to the extent Guiahi remains 50% of the board.

- 13 -

steps to ensure Cardinal successfully acquires the license.

Even assuming Guiahi is breaching Section 6.2, the Court does not find that Cardinal is entitled to the injunctive relief it seeks because Section 6.2 is not sufficiently "certain and fair" to allow for an order of specific performance. Section 6.2 does not define any specific action a board member must take or describe what metrics it uses to determine the "Corporation's success and positive impact on the community."

Cardinal's request for specific performance requires the Court to first determine that acquiring a marijuana establishment license is essential for Cardinal's success and then order Guiahi to sign the attestation consistent with the Court's determination. On this record, the Court is in no position to make such a judgment considering the only two Cardinal board members' competing arguments regarding the ideal direction of the company.

Accordingly, even assuming a substantial issue exists regarding whether Defendant has breached this section of the bylaws or her fiduciary duties, the Court denies Cardinal's request for relief.

### 4. Remaining Issues

The Court has thoroughly reviewed the complaint (Doc. 1-3 at 8–29), motion for TRO filed in Superior Court (Doc. 2), and Cardinal's supplement for this Court (Doc. 9). Given the Court's conclusion on the issues discussed above, the Court is unable to grant Cardinal's requested relief.

Because the Court does not find a serious question as to whether Guiahi remains a member of Cardinal's board, it does not find that any declaration reflecting that she is not a member of the board appropriate. (Doc. 1-3 at 28; Doc. 2 at 18; Doc. 9-2 at 3). Although Cardinal seeks a TRO "enjoining Guiahi from taking any action to obstruct or interfere with Cardinal's application for a marijuana establishment license," such an order would still not allow Cardinal to submit a complete application to ADHS because the department's form requires Guiahi's signature. (Doc. 1-3 at 28; Doc. 2 at 18; Doc. 9-2 at 2–3). Because the Court does not find that specific performance is an available remedy

under its claim for breach of Section 6.2 of its bylaws, the Court will not order specific performance of what Cardinal interprets to be Guiahi's contractual obligation to sign the attestation form at issue. (Doc. 1-3 at 28; Doc. 2 at 14–16).

Although Cardinal's complaint requests in the alternative that the Court "remov[e] Guiahi as a Director and Officer of Cardinal pursuant to A.R.S. § 10-3810(A)," its motion does not request any sort of removal on a temporary basis. (Doc. 1-3 at 29). Nor does Cardinal explain how such an order could actually operate. Since its bylaws require its board of directors to be composed of at least two members (Doc. 1-3 at 39), it seems likely that Guiahi would have to be replaced, at least in the interim, for the board to take any action on behalf of Cardinal. It is unclear if Guiahi was replaced how the Court could restore the status quo if Guiahi ultimately prevailed on the merits. And if the Court could not restore the status quo, it is similarly unclear what an appropriate bond amount would be to compensate Guiahi for the loss of her seat on the board or ability to contribute to corporate decision-making during the time an injunction remains in force, since Cardinal has only requested a waiver of a bond in this case.

Further, for the first time at oral argument, Defendant requested a declaration from the Court that Guiahi breached the bylaws by acting in her personal interest rather than Cardinal's interest. The Court has had no briefing on whether providing such a declaration as interim relief is within the scope of Federal Rule of Civil Procedure 65. Further, whether Guiahi's actions constitute self-dealing is ultimately an issue of fact. It is not apparent that the Court, rather than a jury, could make such a finding to issue a final declaration at this stage in the litigation.

Accordingly, the Court will require Plaintiff to submit a proposed form of order which specifies the relief the Court could grant it, including any specific factual findings the Court must make, and the legal authority for such relief.  This proposed form of Order **must** include a proposed bond amount; if Plaintiff continues to urge the Court to waive the bond rather than propose a dollar amount, the Court will deem such refusal to comply with a Court Order to be a withdrawal of any request for a preliminary injunction.  This proposed

form of order must be lodged by 8:00 a.m., Friday, March 5, 2021.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Cardinal's motion for Temporary Restraining Order (Doc. 2) is **DENIED IN PART** as set forth above. The Clerk of Court shall not terminate the motion until the Court resolves the remaining issues.

**IT IS FURTHER ORDERED** that Cardinal's motion for an expedited trial on the merits (Doc. 9) is **DENIED**.

**IT IS FURTHER ORDERED** that the March 5, 2021 hearing (*see* Doc. 18) is confirmed.

Dated this 4th day of March, 2021.

James A. Teilborg
Senior United States District Judge